UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ELAINE KNIGHT, | : | CIVIL ACTION NO. |
| | : | 3:02-cv-1697 (MRK) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| HARTFORD HOSPITAL, et al. | : | |
| | : | |
| Defendants. | : | November 26, 2003 |

**DEFENDANT HARTFORD HOSPITAL'S MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Hartford Hospital (the "Hospital") submits this Memorandum of Law in support of its Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**I.     FACTUAL BACKGROUND**

Plaintiff, Elaine Knight ("Knight"), began her Hospital employment as Program Coordinator of the 21st Century Community Learning Center Program (the "21st Century Program" or the "Program") on January 8, 2001, reporting to Lynn Satherlie ("Satherlie"), the Program's Director. Complaint ["Comp."], ¶ 10; Knight Deposition Transcript ["Knight Depo."] at p.16, ln.7-11.[1]

The 21st Century Program is a federally funded program that awards grants to urban and inner city public schools to enable them to plan, implement and/or expand projects that benefit educational, health, social services, cultural and recreational needs of the community.

Comp. ¶ 7; Affidavit of Lynn Satherlie Deasy ["Satherlie Aff."] at ¶ 3.[2]  The Program requires public schools to collaborate with other public and non-profit agencies and organizations ("Lead Agencies"), such as the Hospital, in order to meet the needs of and expand the opportunities available to the residents of the community served by the schools. Id.  As a Lead Agency, the Hospital collaborates with the Hartford Public Schools ("HPS") to administer the 21st Century Program at Bulkeley High School ("Bulkeley").  Id., ¶ 4. Although she was employed by the Hospital, Knight performed her job duties as 21st Century Program Coordinator on-site at Bulkeley.  Id., ¶ 6; Comp., ¶ 13.

As Coordinator, it was Knight's responsibility to work with teachers and administrators at Bulkeley as well as with businesses and organizations in the community to fulfill the Program's objectives.  Satherlie Aff., ¶ 6.  Within a few weeks of Knight becoming Coordinator, Satherlie grew concerned that Knight was having problems accomplishing many of her responsibilities; Knight did not appear to be giving her full attention to the Program.  Id. ¶ 7.  During a telephone conversation with Knight on March 21, 2001, Satherlie verbally counseled her that she needed to better focus her efforts on the Program and ensure that she "follow through" on her responsibilities.  Id. ¶ 8.  On March 27, 2001, Satherlie informed Knight that she had documented the March 21 verbal counseling and forwarded a copy to Knight's personnel file in the Department of Human Resources.  Id.

---

[1] See Defendant's Appendix in Support of its Motion for Summary Judgment ("App.") at Exhibit ("Ex.") 1.
[2] See App. at Ex. 2.

Over time, Knight hired several individuals on a part-time basis to assist with the 21st Century Program in various ways. In or about early March 2001, Antoinette Outlaw ("Outlaw") was hired to serve as an instructor in the Program's after-school drill-step class. Id., ¶ 9. In or about mid-March 2001, shortly after Outlaw was hired, Satherlie received a telephone call from Corey Blumenfeld, a Human Resources Assistant at the Hospital. Id. Blumenfeld explained to Satherlie that the Department of Human Resources had just received Outlaw's arrest record and that it revealed a felony conviction that Outlaw failed to disclose in her Hospital employment application. Id. Blumenfeld advised Satherlie that because Outlaw omitted the conviction from her application, consistent with established Hospital policy, her employment needed to be terminated. Id.

As late March of 2001 approached, Satherlie's concerns over Knight's job performance had continued to grow. Id., ¶ 11. During a meeting on March 28, 2001, Satherlie asked Knight to begin compiling weekly timelines identifying the specific tasks that she needed to accomplish. Id. When they met again on April 9, 2001, Knight still had not compiled a timeline as Satherlie had previously requested. Id. As a result, on April 12, 2001, Satherlie met with her supervisor, Susan Maxwell ("Maxwell"), along with Human Resources Consultant Ed Hachadourian to discuss Knight's performance. Id. In consultation with Hachdourian and Maxwell, Satherlie decided that Knight should be placed in the Hospital's Performance Improvement Process. Id. She was provided with a written warning and was given a specific timetable within which to accomplish many key program objectives. Id., and Tab E.

3

In early May 2001, Satherlie gave Knight authorization to hire a part-time administrative assistant to assist her with her Program responsibilities. Satherlie Aff., ¶ 13. Knight hired Erica Stansiclaus (Black). Id. Shortly thereafter, when Knight told Satherlie that she still needed more secretarial help, Satherlie authorized Knight to hire a second part-time administrative assistant, Madonna Jean Noir (White).[3] Id., ¶ 14.

On April 9, 2001, Knight informed Satherlie that the Program needed office supplies. Id.,¶ 16. Satherlie told Knight to simply purchase the supplies and to submit the receipts for reimbursement. Id. However, Knight told Satherlie that she could not afford to advance the funds for the supplies. Id. So Satherlie asked Knight to make a list of supplies the Program needed and she would purchase them. Id. That same evening, Satherlie purchased the supplies then gave them to Knight the following day. Id., and Tab I. In the following weeks, Satherlie purchased supplies at Knight's request on several additional occasions. Id.

On or about April 30, 2001, Knight told Satherlie that she suspected that Emil Nace, a Bulkeley teacher who had been hired to teach an SAT prep course for the Program, had falsified his time sheets and other documents. Id., ¶ 12. Knight did not provide Satherlie with any evidence to support her suspicions. Id. Later, on May 9, 2001, Knight told Satherlie that she had enlisted a teacher from Bulkeley to assist her in her investigation of Nace. Id., ¶ 17. Again, the information Knight provided to Satherlie as a result of her investigation was vague and inconclusive. Id. At her deposition, Knight admitted that she did

_____

[3] During the time she worked for the Program, from the week of May 7, 2001 through the week of June 25, 2001, Stansiclaus, who is Black, worked a total of 227 hours, or an average of 28.4 hours per week. Meanwhile, during the time she was employed, from the week of May 14, 2001 through June 20, 2001, Noir, who is White, worked a total of 118 hours, or an average of 19.7 hours per week. Satherlie Aff., ¶¶ 13 and 14.

not know whether Nace taught the course as he had claimed.  Knight Depo., p.165, ln.16-20; p.168, ln.25; p.169, ln.1-3.   Because the information Knight provided was inconclusive, Satherlie told her that she could either get the Bulkeley Principal involved and pursue her investigation further in an attempt to hold Nace accountable for any improprieties, or use the situation as a learning experience, because as Coordinator, monitoring Nace's SAT prep course and reviewing his timesheets were both her responsibility.  Satherlie Aff., ¶ 17. Apparently, Knight chose the latter.

On June 6, 2001, Knight was absent from the mandatory weekly 21st Century Program meeting. Knight Depo., p.84, ln.10-19; Satherlie Aff., ¶ 22.  Knight told Satherlie that she was not at the meeting because she was on the phone with her assistant, Madonna Noir, who was upset over changes in how employees in the Program were bring paid. Id., p.84, ln.10-19; Satherlie Aff., ¶ 22.   As Knight and Satherlie continued their conversation, Knight then told Satherlie that the real reason she missed the meeting was because she had a seizure.  Id., p.89, ln.1-7; Satherlie Aff., ¶ 22.  Knight's changing story caused Sathlerlie to question her truthfulness. Satherlie Aff., ¶ 22.  The following day Satherlie gave Knight a written warning stressing how important it was for Knight to be truthful in their dealings together. Id., and Tab L.  Knight took the written warning, walked into her office where her administrative assistants Stanisclaus and Noir were located, allowed each of them to read the warning, then yelled at Satherlie repeatedly accusing her of writing the warning in an attempt to get her fired. Satherlie Aff., ¶ 23.  Knight testified that the language she used toward Satherlie on this occasion was disrespectful. Knight Depo., pp.91-94.

Upon returning to work on Monday, June 18, 2001 from a one-week vacation, Satherlie received a telephone call from Irizarry, the Bulkeley Principal. Satherlie Aff., ¶ 24. Irizarry told Satherlie about an incident, involving Knight, which occurred on Friday, June 15, during which Knight made rude and inappropriate comments to her and two other Bulkeley administrators. Id. In a letter to Satherlie dated June 20, 2001, Irizarry described Knight's conduct:

> I was in my office meeting with a teacher when Ms. Elaine Knight came to the door and just stood there. I asked her to please excuse us since we were having a meeting and still she did not move. She just kept looking at me. I finally asked her what can I do for her and her response was "I guess you are too busy to see me, never mind." I told her to please see my secretary to schedule an appointment and she said: "I did, but everybody is too busy." I told her that it is true that we are all very busy; it is the closing of the school year. She then walked away mumbling something and giving body language and quite an unprofessional attitude. I expressed my concern regarding her attitude and she continued mumbling. I did hear her say: "You have an attitude." There were visitors in the Main Office who witnessed this incident. Had a HBOE employee behaved in such a manner, I would have recommended suspension pending an investigation. This is clearly defiance and insubordination.

Id., ¶ 24, and Tab M.

Irizarry also enclosed memos from Vice Principal Santiago ("Santiago"), and her Administrative Assistant, Margarita Santana ("Santana"), documenting their observations of Knight's inappropriate conduct on June 15. Id. In his memo to Knight, Santiago wrote:

> You came into the data room and requested to meet with me. I then replied to you that I could not meet with you at that this moment. The reason being that I had scheduled a meeting with a parent at the time. I told you that I was willing to meet with you, after I was done meeting with the parents. You came towards me insisting to meet with me. I gave you the same response as before. You kept following me into my conference room using a loud tone of

voice, and a very rude and unprofessional behavior.  During your verbal abuse towards me, which you were yelling, you used the following statements:

- You will not speak to me because I'm a black woman.
- You called me a coward for not speaking with you at that precise moment.

Id.

Similarly, Irizarry's assistant, Santana, described Knight's conduct:

On Friday, June 15, 2001 Ms. Knight came to the Main Office and from the counter she asked me if she could see Ms. Irizarry, Principal.  I told her that Ms. Irizarry's calendar was full for Friday, however I suggested that she could make an appointment for the following Monday, June 18th.

Ms. Knight got upset and from the main counter started making inappropriate comments.  I told her that she should express and discuss her concerns with Ms. Irizarry on Monday.  She continued making inappropriate comments and I repeated three times that she should discuss her concerns with Ms. Irizarry on Monday.  She left the office very upset and said she was going to look for Mr. Santiago.  Ms. Knight never gave me the opportunity of setting up the appointment and left the main office abruptly.

Later on she came back to the Main Office but this time she did not speak to me and went directly to Ms. Irizarry's office and stood by her door.  Ms. Irizarry was meeting with a teacher and asked Ms. Knight to excuse her.  Ms. Knight got very upset and while walking away said: "You have an attitude problem and you know it."

Id.

As a result of Knight's June 6th verbal outburst toward Satherlie, her questionable truthfulness, continuing performance problems, and, most importantly, her rude and unprofessional conduct toward the Bulkeley staff as documented by Irizarry, Santiago and Santana, Satherlie decided to end Knight's involvement with the 21st Century Program and terminate her Hospital employment.  Id., ¶ 25.

7

Satherlie consulted with her supervisor, Susan Maxwell (White), who agreed with her decision. Id.

On June 21, 2001, Satherlie and Maxwell met with Knight and advised her Hospital employment was being terminated due to her unprofessional statements and conduct toward the Bulkeley administrators, her outbursts toward Satherlie, her questionable truthfulness about why she missed the mandatory June 6 meeting, and her continuing performance problems. Id., ¶ 26. During their meeting, Knight presented Satherlie and Maxwell with a memo, which, according to Knight, addressed several of the reasons for her lack of progress as Program Coordinator. Id., ¶ 27. Maxwell told Knight that they would suspend the meeting to consider the issues raised in her memo. Id. After considering the memo, Satherlie and Maxwell concluded that it did not mitigate any of the factors Satherlie relied on in making the decision to terminate Knight's employment. Id., ¶ 28.

Satherlie and Maxwell attempted to arrange another meeting with Knight on June 22, 2001, but were informed by her husband that she would be unable to attend. Id. By memo dated June 22, 2001, Maxwell informed Knight that the decision to terminate her Hospital employment remained unchanged, and that her employment was terminated effective June 22. Id., and Tab O.

## II.     PROCEDURAL HISOTRY

On or about September 23, 2002, Knight filed a Five Count Complaint against the Hospital, HPS, Satherlie and Maxwell, alleging as follows: Count One – Violation of Title VII, 42 U.S.C. § 2000e et seq. (as to the Hospital and HPS); Count Two – Violation of Connecticut Fair Employment Practices Act ("FEPA"), Conn. Gen. Stat. § 46a-60 et seq.

(as to the Hospital and HPS); Count Three - Violation of 42 U.S.C. § 1981 (as to Satherlie and Maxwell); Count Four – Negligent Infliction of Emotional Distress (as to all defendants); and Count Five – Intentional Infliction of Emotional Distress (as to all defendants).

On November 22, 2002, the Court granted plaintiff's motion to withdraw her FEPA claim in Count Two. Later, on February 14, 2003, the Court dismissed the Complaint in its entirety as to Satherlie and Maxwell due to plaintiff's failure to make proper service. Then, on January 6, 2003, the Court granted the Hospital's motion to dismiss plaintiff's claims for negligent and intentional infliction of emotional distress in Counts Four and Five. Plaintiff's sole remaining claim against the Hospital is Count One, for violation of Title VII. The Hospital now moves for summary judgment on Count One.

## III.    LAW AND ARGUMENT

### A.    Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Courts within the Second Circuit "have not hesitated to grant defendants summary judgment in such cases where, as here, plaintiff has offered little or no evidence of discrimination." Scaria v. Rubin, 1996 U.S. Dist. LEXIS 9659, at * 14 (S.D.N.Y. July 11, 1996)[4] (citing Woroski v. Nashua Corp., 31 F.3d 105, 109-110 (2d Cir. 1994); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 106 S. Ct. 91 (1985); see also Grady v. Affiliated Cent., Inc., 130 F.3d 553, 561 (2d Cir. 1997); Brennan v. Metropolitan Opera Ass'n, Inc., 1998 U.S.

9

Dist. LEXIS 5562, at *22-23  (S.D.N.Y. Apr. 22, 1998)[5] ("Although courts must be cautious in applying Rule 56 to discrimination cases . . . summary judgment is appropriate if the record is insufficient to permit a reasonable jury to return a verdict in the plaintiff's favor") (internal citations omitted).

A district court deciding a summary judgment motion must be provided with admissible evidence demonstrating the truth of the non-movant's assertions.  See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2ⁿᵈ Cir. 1997) (bald assertions not based on personal knowledge were properly ignored by district court in granting summary judgment). Similarly, reliance upon conclusory statements or mere allegations is not sufficient to defeat a motion for summary judgment.  See Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2ⁿᵈ Cir. 1993).

**B.      Plaintiff's Claim for Disparate Treatment Race Discrimination Must Fail as a Matter of Law.**

Knight alleges that the Hospital has treated her "differently from other employees by subjecting her to harassment, by subjecting her to unequal discipline, by employing supervisory discretion in a discriminatory manner to unfairly discipline her and by terminating her." Comp., ¶ 1.  Specifically, she claims that "she was not given access to basic office resources that the other employees were, such as phones, fax machine, copier, scissors, etc., despite numerous requests to her Supervisor, Defendant Satherlie." Id., ¶ 14. She also claims that her office was "dismantled" and that no one explained why. Id., ¶ 15.

---

[4] See App. at Ex. 3.
[5] See App. at Ex. 4.

Further, upon information and belief, she alleges that Satherlie treated other African Americans differently in various ways. Id., ¶ 18.

The standard of proof for demonstrating race discrimination under Title VII is well established. First, the plaintiff must establish a prima facie case of discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. See De La Cruz v. New York City Human Resources Admin., 82 F.3d 16, 20 (2nd Cir. 1996) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Once the plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse action. See Id. If the employer meets this burden, the plaintiff then must prove that the articulated justification is in fact a pretext for discrimination. See Id. (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993).

(1)    **Knight cannot establish a prima facie case of race discrimination.**

Knight cannot establish a prima facie case of race discrimination because she cannot demonstrate that she was terminated or otherwise disciplined "under circumstances giving rise to an inference of race discrimination." De La Cruz, supra. As evidence of race discrimination, Knight alleges that she "was treated differently than similarly situated employees" and that "on numerous occasions, Defendant Satherlie treated African Americans differently than Caucasians."[6]

---

[6] See Comp. ¶¶ 12, 14.

11

It is true that a plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably.  See Shumway v. United Parcel Service, Inc., 118 F.3d 60, 63 (2nd Cir. 1997).  In order to make such a showing, however, the plaintiff must compare herself to employees who are "similarly situated in all material respects."  Id. at 64.  While the ultimate burden in making a prima facie case is slight, "the issue of whether of whether fellow employees are similarly situated is somewhat strict."  Brown v. Middaugh, 41 Supp. 2d 172, 184 (N.D.N.Y. 1999).  In order to be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Id. (citing Mazzella v. RCA Global Communications, Inc., 642 F. Supp. 1531, aff'd, 814 F.2d 653 (2nd Cir. 1987)).

As discussed more thoroughly below, Knight cannot demonstrate that White employees were treated better than she or other Black employees because: (1) they were not similarly – and - (2) there is simply no evidence of different treatment.  In her sworn responses to the Hospital's First Set of Interrogatories, Knight alleges the following different treatment:[7]

---

[7] See App. at Ex. 5. Interrogatory No. 7 states: "With respect to your allegation in Paragraph 14 of the Complaint, that you were 'treated differently than similarly situated white employees,' identify (a) each and every way in which you were allegedly treated differently; (b) the individuals responsible for such different treatment; and (c) every individual whom you believe has personal knowledge pertaining to this allegation, indicating the nature and substance of his/her knowledge."  Plaintiff responded: "a) See Response to Interrogatory #5.  In addition, Madonna Noir was provided with office supplies upon request when Plaintiff was forced to pay out of pocket. Madonna was alloed [sic] to have flexible hours when the Plaintiff was not. Lynn

(a)    Knight Was Allegedly Required to Pay "Out of Pocket" for
Office Supplies.

Plaintiff alleges that Satherlie provided Knight's administrative assistant, Madonna

Noir, who is White, with office supplies upon request while she was forced to pay "out of

pocket."[8]  Knight testified that when Noir began as her administrative assistant, she went to

Knight and told her that she needed office supplies.  (Knight Depo., p.144, ln.10-15).

Knight replied that she could not get the supplies for her because she had to purchase them

out-of-pocket and did not have the funds to do so.  Id., p.144, ln.9-25; p.145.  Knight claims

that Noir went to Satherlie, gave her a list of supplies, and Satherlie purchased the supplies

for her.  Id., p.142-145.  Knight claims disparate treatment because Satherlie allegedly

required her to advance the funds for supplies then seek reimbursement.  Id., p.147-148.

Even if Knight's allegation – that on one occasion Satherlie provided Noir with office

supplies while she was required to pay for the supplies out of pocket then seek

reimbursement – is accepted as true, the following facts are undisputed: (1) Knight only paid

for supplies out-of-pocket, if ever, on no more than two or three occasions (Id., p.148, ln.3-

6); (2) according to Knight, the cost of the supplies was insignificant (Id., p.149, ln.5-6); (3)

any time Knight advanced funds for office supplies she was reimbursed. (Id., 147, ln.17-19).

This alleged different treatment is *so insignificant* that it cannot possibly amount to evidence

of race discrimination.

---

addressed Madonna in a respectful manner, unlike how the plaintiff was treate [sic].  Emil Nace received pay
for hours that he did not work, while plaintiff worked normal hours plus overtime and did not receive overtime
pay. b) Lynn Satherlie. C) See attached." The alleged incidents of different treatment discussed in plaintiff's
response to Interrogatory 5 and in response 7(C) are all discussed above in sections B(1)(a)-(j) of the Hospital's
argument.

[8] See App., Ex. 5, at No. 7

Furthermore, Knight has no evidence that Satherlie ever refused to purchase supplies for her. In fact, on April 9, 2001, when Knight told Satherlie for the first time that she could not afford to advance funds for office supplies, Satherlie asked Knight to compile a list of supplies she needed. Satherlie Aff., ¶ 16 . Satherlie then purchased the supplies that evening and gave them to Knight the following day. Id. In fact, Satherlie purchased supplies for Knight on several additional occasions. Id.

Lastly, even if Knight were able to present admissible evidence to support her claim that Satherlie required her to advance funds for office supplies while Satherlie provided Noir supplies upon request, Knight and Noir were not similarly situated. Knight was the Coordinator of the 21st Century Program, a full-time managerial employee, earning a salary of $39,000 per year. Id., ¶ 5. Noir, however, was a part-time, temporary employee serving as an Administrative Assistant earning $12.00 per hour. Id., ¶ 14. Even if Satherlie had required Knight to purchase supplies out-of-pocket and then submit her costs for reimbursement (which Satherlie denies), the difference in Knight's salary – and, presumably her ability to advance such funds – compared to that of the lower paid Noir, accounts for any alleged differential treatment.

(b)    Alleged "Inflexible Hours"

Knight claims that Satherlie allowed Noir to have flexible working hours but she was not allowed to have a flexible work schedule.[9] However, Knight admitted in her deposition that this allegation was inaccurate because she never asked Satherlie for flexible work hours:

---

[9] See App., Ex. 5, at No. 7.

14

> Q:   Your allegation is that Madonna was allowed to have flexible work hours and you were not. I want to know what flexible hours you requested. I want to know when you made this request.
>
> A:   I didn't formally make any request because I didn't feel like I could. It was just such a demand and pressure on me. I had so much workload that to put in a request for time or flexible hours, I wasn't even getting paid for the stuff I did at home nor the overtime, so time off was like out of the question.
>
> Q:   *So this would be inaccurate when it says that Madonna was allowed to have flexible work hours when you were not, because you, in essence, never asked to have flexible work hours?*
>
> A:   *I guess, yes.*
>
> Q:   *So that's inaccurate?*
>
> A:   *I guess you could say that, yes.*

Knight, p.209, ln.8-25; p.210, ln.1 (emphasis added).

Furthermore, the undisputed evidence demonstrates that Knight did, in fact, work flexible hours. Knight testified that her regular working hours were 8:00 AM to 4:00 P.M. Knight Depo., p.208, ln.9-15. However, her timesheets reflect that she *rarely ever* worked a strict 8:00 AM to 4:00 PM schedule. Id., p.210, ln.9-25; p.211, ln.1-12.[10] Rather, as her timesheets reflect, she routinely began her workday between 9:00 AM and 11:00 AM. Id.

Even if plaintiff could proffer any admissible evidence that Satherlie allowed Noir to have flexible working hours but denied a similar request by her -- which she cannot do, based on her own sworn deposition testimony -- Knight and Noir were not similarly situated. Knight was the salaried full-time Coordinator of the 21st Century Program and had managerial responsibilities. Knight, p.42, ln.7-25; p.213, ln.10-16. Noir, by contrast, was one of two part-time hourly administrative assistants. Satherlie Aff., ¶¶ 13 and 14. Lastly, as Noir's supervisor, Knight -- not Satherlie -- was solely responsible for setting Noir's working hours. Id.

15

(c)   Alleged Disrespectful Treatment of Plaintiff

Knight claims that Satherlie "addressed Madonna [Noir] in a respectful manner, unlike how [she] was treated."[11]  However, Knight has no evidence to support this allegation. She testified at her deposition as follows:

Q:   Interrogatory 7, "Lynn addressed Madonna in a respectful manner, unlike how Plaintiff was treated." I would like you to tell me specifically, are you referring here to -- are you claiming that Ms. Satherlie addressed you in a disrespectful manner?

A:   Courteous. She tended to be polite, kind and more friendly toward Madonna than me.

Q:   Can you provide me with any specifics of how you were treated such as it states here in your sworn response to interrogatory 7?

A:   *She would come in and sometimes she would question Madonna about things and I would stand there and either have – if I was talking to Lynn, Madonna would interrupt me, interject and say, "I can find this, I can do that." And I felt that they just had developed a rapport, you know, where I was not in the loop.*

Q:   I would like you to identify for me any specific events that you can recall in which you claim that Ms. Satherlie, or Ms. Maxwell, spoke with you disrespectfully.  Any specific events, specific conversations?

A:   *Well, when Lynn sat in the cafeteria that day and she said that I was a liar, that I was lying to her, the day that I didn't make the meeting, I thought that that was totally out of order because she didn't really give me a chance to talk.  And after I explained it to her, she still went in and wrote up that I was lying to her.  So, I just felt that that was a lack of respect.  And – I'm tired.*

Q:   Is there anything about that conversation to suggest to you that she was showing you disrespect because you're African-American?

A:   It was a tone and manner.  It was always a demeaning tone and manner.  It was an overall general tone and manner.

Q:   Is that it?

A:   Yes.

Knight Depo., p.211, ln.14-25; p.212; p.213, ln.1-4 (emphasis added).

---

[10] See App., Ex. 6, Knight's Timesheets

[11] See App., Ex. 5, at No. 7.

As Knight's testimony demonstrates, when asked for an example of how Satherlie spoke to Noir in a respectful manner, but spoke to her in a disrespectful manner, Knight could recall only one occasion when she was speaking with Satherlie and Madonna allegedly interrupted. Whether Noir interrupted Knight on one occasion or a hundred occasions, Noir's lack of social etiquette lends no support to Knight's claim that Satherlie discriminates based on race. Knight also claims that Satherlie spoke to her in a "demeaning tone and manner."

Knight also alleges that on another occasion, during a 21st Century Program Advisory Meeting, Satherlie allowed the "Caucasian teachers to speak and state their opinions" but that Satherlie addressed Knight rudely.[12]  At her deposition, Knight testified as follows:

Q:   I'm sorry. There is no question pending. And you say, "See attached." At the end of interrogatory No. 7, your response to No. 7, you say, "Individuals who have personal knowledge of discrimination against the plaintiff." And you say, "Carol Green attended April 2001 Parent Advisory Board meeting and observed Lynn Satherlie allowing Caucasian teachers to speak and state their opinions while addressing the plaintiff rudely." Which Caucasian teachers are you claiming were allowed to speak?

A:   I would have to look. It was general conversation. And when it was over, Ms. Green and I spoke. And she, by us both being two African-American women, we know and feel in the sense when you're being discriminated, it's something that you can communicate with the eyes, and she came to me and tried to comfort me. And I let her know it was okay.

Q:   And what was it specifically that led you to the conclusion that after that meeting that you were being discriminated against because you were African American? I want to know the specific factual basis for your belief at that time.

A:   Because they were allowed to voice their opinion. They were allowed and granted permission to speak. They were addressed in a very, very cordial and polite manner. And she made some comments to me about – oh, I had prepared the summer program and I had – it was a handout to the Advisory Board meeting, or if it wasn't the summer program – I'm sorry. It was the

---

[12] See App. Ex. 5, at No. 7.

goal and objective, but there was a handout I had submitted to everyone in the Advisory Board meeting. And they were reading it like we are, reviewing it. Before Lynn even read it, she began to state what was missing and just said, "You were supposed to put this in and you didn't put this in." And when she finished chewing my document apart, I turned to her, and said, "Yes, it's on such and such a page." And then Ms. Green looked over at me, and I looked at her, and it was like, "Okay."

Q:    So you're saying Lynn was rude to you?

A:    Yes.

Q:    Now, other than that, do you have any other factual basis for claiming that Ms. Satherlie's conduct at this meeting is evidence of race discrimination other than what you just testified to?

A:    Not at this time. I'm really tired.

Knight Depo., pp.214-216.

There is nothing about Satherlie's alleged conduct at this meeting that is evidence of race discrimination. Even if Knight's testimony is accepted as true, it reflects nothing more than her supervisor commenting upon her work. Knight's own conclusory allegations and subjective feelings are not evidence of race discrimination. Even if Satherlie spoke rudely to Knight at the meeting – which Satherlie denies -- it is well established that Title VII is not a "general civility code." Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 118 S. Ct. 998, 1002 (1998).

(d)    Nace Allegedly Received Pay for Hours He Did Not Work, while Plaintiff Worked Normal Hours Plus Overtime and Did Not Receive Overtime Pay.

(e)    Satherlie Fired a Black Teacher Because She Allegedly Lied on Her Job Application, But Told Plaintiff to Pay a White Teacher Who Had Falsified Attendance and Permission Slips.

Knight claims that Satherlie treated Nace - a White part-time temporary employee hired to teach an SAT prep class for the 21st Century Program -- better than she treated African American employees. She alleges that when she told Satherlie that she suspected

18

Nace had falsified documents relating to his SAT prep course, Satherlie said to her "what difference does it make, pay him anyway."[13] She claims that Satherlie treated Black employees differently than Nace in that: (1) Knight did not receive overtime pay – whereas Nace was allegedly paid for time he did not work; and (2) Satherlie terminated a Black employee for allegedly lying on her application – whereas Nace allegedly falsified his timesheets and other documents.[14] Her allegations of "different treatment" lack merit.

First, Knight and Nace were not similarly situated. Knight was a full-time salaried employee of the Hospital earning $39,000 per year. Satherlie Aff., ¶ 5. Knight was not paid overtime as Program Coordinator not because she was Black – but rather because the Hospital's Department of Human Resources determined that the role of Program Coordinator was overtime-exempt under the Fair Labor Standards Act.[15] Satherlie played absolutely no role in making this determination. Id.

Nace, on the other hand, was a full-time HPS employee who was hired by the Hospital on a temporary, independent contractor basis to teach an SAT prep class for the 21st Century Program. Id., ¶¶ 12 and 18. Knight told Satherlie that she believed Nace was falsifying attendance sheets and other documents relating to the SAT prep class. Knight Depo., pp.151-163. It is undisputed, however, that Knight failed to present her with any documentary evidence to support her suspicions. Id., p.161. Moreover, Knight admitted at her deposition that she does not know whether Nace, in fact, taught the SAT classes he

---

[13] See Comp. ¶ 18.

[14] See App., Ex. 5, at No. 7; Comp., ¶ 18.

[15] Knight admitted at her deposition that the Hartford Hospital Role Description for 21st Century Project Coordinator accurately described her duties. See Knight Depo., p.42, ln.7-25; p.; App. Ex. 7 (Role

19