2CV1697memosupl

claimed to have taught. Id., pp.168-169. Because what little evidence Knight presented Satherlie with was inconclusive, Satherlie gave Knight the option of pursuing her investigation further and involving the Bulkeley Principal. Satherlie Aff., ¶ 17. However, Knight chose not to do so.

Unlike the vague allegations of wrongdoing that Knight made against Nace, the circumstances surrounding Outlaw's wrongdoing – which led the Hospital to terminate her relationship with the Program -- were clear-cut and unambiguous. It is undisputed that in mid-March 2001, Satherlie received a telephone call from Corey Blumenfeld ("Blumenfeld"), a Human Resources Assistant with the Hospital's Department of Human Resources, informing her that the Hospital had just obtained Outlaw's criminal background check and that it revealed that she had been convicted of a felony. Id., ¶ 9, and Tab B.[16] Blumenfeld told Satherlie that Outlaw failed to disclose the conviction on her Hospital application, and, as a result, Outlaw's employment had to be terminated because making a false statement on the Hospital's employment application was a violation of Hospital policy. Satherlie Aff., ¶ 9, and Tab C.[17] Satherlie did not make the decision to terminate Outlaw's employment. Id., ¶ 9. That determination was made by the Department of Human Resources. Id. In addition to the reasons discussed above, because Satherlie played no role in the decision to terminate Outlaw's employment, Nace and Outlaw were not similarly

Description). It should also be noted that Knight has not filed a claim in any forum claiming that the Hospital owes her any overtime pay.

[16] In Connecticut, individuals working with students must be fingerprinted, and have those fingerprints reviewed by the Connecticut State Police against the state's criminal conviction records. See Conn. Gen. Stat. § 10-221(d).

situated and, therefore, any alleged differences in the way they were treated cannot raise an inference that race was a factor.[18]

In her response to Interrogatory No. 5, Knight alleges the following discriminatory acts:[19]

(f) Alleged Failure to Provide Supplies, Resources, Transportation and Administrative Support – Unfair Expectations Placed on Plaintiff by Satherlie to Transport Students in Her Car.

As previously discussed above, plaintiff claims that she was required to advance funds for various office supplies on no more than three occasions. It is undisputed, however, that even if plaintiff did advance funds for supplies on no more than three occasions she was fully reimbursed. Knight Depo., p.147, ln.17-19. In addition, plaintiff claims that she was denied access to various resources such as a fax machine, copier, and email. Id., pp.216-221. However, even if Knight were denied access to such things, which the Hospital denies, there is absolutely no evidence that such denial was due to her race. Plaintiff testified at her deposition as follows:

---

[17] Despite a diligent search, the Hospital has been unable to find Outlaw's application. However, the hospital has provided a copy of the Rules of Conduct as they apply to supplying accurate information on applications for employment.

[18] Furthermore, based on Satherlie's information and belief, she had no knowledge of Nace's race until Knight filed her complaint with the Connecticut Commission on Human Rights subsequent to her termination. Satherlie Aff., ¶ 12.

[19] See App., Ex. 5. Interrogatory No. 5 asks: "[W]ith respect to your allegation contained in Paragraph 10 of the Complaint that "Defendant Lynn Satherlie ... has personally engaged in, approved, condoned and acquiesced in all retaliatory and discriminatory actions material hereto," identify each and every individual whom you believe has personal knowledge pertaining to this allegation, indicating the nature and substance of his/her knowledge." See App., Ex. 5, at No. 5. Many of the alleged discriminatory acts raised by plaintiff in response to this Interrogatory are the same acts discussed in his response to Interrogatory No. 7 and have previously been addressed above.

Q: Do you have any factual basis, any facts that you can articulate as you sit here today to support any claim that you were denied any of these things, a copier, fax, printer, or access to email due to your race?
A: Well, it appeared that the other non-African-American people had access to things that I didn't have access to. And I just had to accept that fact, that I would not have those resources.
Q: When you say the other non-African-American people, who are you talking about?
A: Some of the staff.
Q: *Those were employees of the Hartford Public Schools?*
A: *Right.*
Q: But you weren't employed by Hartford Public Schools. You were employed by Hartford Hospital?
A: But Hartford Hospital was responsible for me running a program and they were responsible for providing me with resources. You cannot tell me to make a cake and don't give me flour.
Q: I understand, but Hartford Hospital was not responsible for providing a copier, a fax machine, a telephone, a printer, and email access to all the employees of the Hartford Public Schools, correct? They didn't provide those resources to the Hartford Public Schools?
A: Are you saying to the Hartford Public Schools?
Q: Yes.
A: No. You're saying Hartford Hospital was not responsible for providing those resources to Hartford Public Schools?
Q: That's my question.
A: Yes. It was not.
Q: It was not Hartford Hospital's responsibility to provide those to the employees of the Hartford Public Schools.
A: Yes.
Q: That was the responsibility of the Hartford Public Schools, correct?
A: Yes.

Knight Depo., p.221-222 (emphasis added).

Plaintiff's only factual basis for her claim that she was denied access to various resources – such as a fax machine, copier, telephone, and email – based on her race, is her belief that non-Black HPS personnel had access to such resources while she allegedly did not.

Id.; see also Id., p.275-281.[20] However, neither Satherlie nor any other Hospital employee played any role in providing these resources to the HPS staff. Id. Even if the HPS staff had access to such resources and Knight did not, it is not evidence that Satherlie or any other Hospital employee treated Knight differently because of her race.

With respect to her claim that unlike White Program Coordinators she was not being provided with transportation for her after-school programs causing her to transport students in her own car, Knight has absolutely *no factual basis* to support this claim. She testified as follows:

> Q: I am going to ask you this question: Do you have any factual basis to believe, or do you have any factual basis for your claim that you were not being provided with bus transportation based on your race?
> A: I feel that they had other after-school programs who had coordinators that were White who got the support from the Board of Ed or Hartford Hospital to transport students for field trips, whatever, and they received that and I couldn't. I was just running around in a circle.
> Q: Hartford Hospital is not involved in any other 21st Century Programs, correct?
> A: Not to my knowledge. You would have to pose that question to Lynn.
> Q: Your response to my question is that you said other schools, other programs, had gotten the support from Hartford Hospital, but you don't know – let me finish the question – you don't know whether Hartford Hospital has anything to do with any other programs though, correct?
> A: Yes. I don't know that.
> Q: You don't know that?
> A: No.
> Q: So, therefore, you have no basis to claim that Ms. Satherlie or Hartford Hospital treated any other 21st Programs with White program coordinators differently than she treated you, correct?
> A: Correct.

---

[20] In fact, Knight's testimony reveals that she did have access to things such as a copier and a fax machine in the BHS administrative office. However, she maintains that she could not use them because they were always in use by BHS employees. (Knight, p.216, ln.24-25; p.217, ln.1-18; p.219, ln.12-25; p.220, ln.1). Knight even admitted that she had no factual basis to support a claim that any of the Bulkeley staff denied her access to the copier based on her race. (Id., p.280, ln.20-25; p.281, ln.1-12).

Knight Depo., p.75, ln.25; p.76, ln.1-25; p.77, ln.1-5. In fact, it is undisputed that the Hospital is not affiliated with any other 21st Century Programs. Satherlie Aff., ¶ 4.

(g) Satherlie's Alleged "Unfair Hiring Practice"

Plaintiff claims that another example of Satherlie treating Black employees differently than White employees is the fact she, along with Stanisclaus and Outlaw, had to go through a certain "hiring procedure" involving Hartford Hospital's Department of Human Resources while Nace was not required to do so. Knight Depo., p.187; ln.14-24.

Knight, as a full-time Hospital employee was required to complete all normal Hospital hiring procedures, including but not limited to drug screening, a physical examination, new employee orientation and completing the necessary tax forms. Satherlie Aff., ¶ 5. Initially, other individuals who were going to work for the 21st Century Program, such as Stanisclaus and Outlaw, were hired by the Hospital not as employees, but rather as independent contractors. Id., at ¶18. However, because they were going to be working with children, the Program Director for the Hartford Public Schools advised Satherlie that all such independent contractors still needed to undergo a criminal background check. Id. Nace was a teacher within the Hartford Public Schools who worked with school children on a daily basis and who – unlike Stanisclaus and Outlaw -- had presumably already been fingerprinted and undergone a criminal background check. Id. Therefore, the Hospital did not require him to do so again as a prerequisite to working with the 21st Century Program. Id. Later, in early June 2001, the Hospital's payroll department determined that all individuals performing work for the Program could no longer work for the Hospital as independent contractors but

had to become Hospital employees by completing all necessary tax forms, undergoing a physical, and complying with all pre-employment requirements. Id., ¶ 19, and Tab J.

Further, plaintiff has absolutely no evidence that Satherlie was the decision maker with respect to which pre-employment administrative procedures that individuals working in the 21st Century Program needed to follow. In fact, the Hospital's Department of Human Resources made that determination, not Satherlie. Id., ¶ 19. Any alleged differences between the Hospital's administrative requirements imposed on Nace versus those imposed on Knight, Stanisclaus and Outlaw, are not evidence of any different treatment by Satherlie.[21]

(h) Satherlie Allegedly Told Plaintiff to "Ignore Warning Letters"

Knight claims that Satherlie allegedly told her to ignore her written performance warnings. Satherlie vehemently denies that she ever told plaintiff to disregard any of the written warnings she received. Satherlie Aff., ¶ 23. Further, no such warnings were ever removed from her personnel file. Affidavit of Ed Hachadourian ("Hachadourian Aff."),[22] ¶ 5. Regardless, viewing all facts in the light most favorable to the plaintiff, even if Satherlie had told Knight to ignore any of her written warnings, this conduct alone is not evidence that Satherlie treated White employees better then Black employees, nor is it evidence of a discriminatory intent.

---

[21] The remainder of the issues raised by plaintiff in Paragraphs 5(b) and 5(c) in her response to Interrogatory No. 5 relate to plaintiff's claim that Satherlie ordered her to pay Nace after Knight told her about her suspicions that Nace had "falsified" his timesheets and other documents relating to the SAT prep class. See App., Ex. 5, at No. 5. This allegation has already been thoroughly addressed above.

[22] See App., Ex. 8.

    (i) Plaintiff's Office was "Dismantled" and Satherlie Failed to Support Knight or Seek an Explanation from Bulkeley Administrators.

Plaintiff alleges that on May 24, 2001 she arrived at work at Bulkeley to find that her office had been "dismantled" and that certain files from her desk were missing.[23] However, plaintiff concedes that she has no reason to believe that Satherlie or any Hospital employee was responsible for the office being "dismantled" or any files disappearing. Knight Depo., p.108, ln.3-13; p.119, ln.19-25; p.120, ln.1. Knight also testified that Satherlie told her that Irizarry would meet with her to discuss why her desk was disturbed. Id., p.120, ln.1-6. In fact, when Satherlie learned that plaintiff's workspace at Bulkeley had been disturbed, she spoke with the Principal Irizarry and was assured that Vice Principal Santiago would meet with Knight to discuss what had happened. Satherlie Aff., ¶ 21. Contrary to Knight's allegations, Satherlie did, in fact, intercede on Knight's behalf. There is nothing about this incident that evidences any preferential treatment by Satherlie of White employees or any discriminatory intent.

In addition to the alleged discriminatory conduct discussed above, in her response to Interrogatory number 10, Knight alleges that Satherlie treated Black employees differently in the following ways:[24]

(j) Outlaw Was Allegedly Not Paid "On Time" While Nace Was Paid Promptly.

---

[23] See Comp. ¶ 15; App., Ex. 5, at 5(e).

[24] Interrogatory No.10 states "With respect to your allegation in Paragraph 18 of the Complaint, that "upon information and belief, on numerous occasions, Defendant Satherlie treated African-Americans differently that Caucasians," identify each and every occasion when Ms. Satherlie allegedly treated African Americans differently than Caucasians...." See App., Ex. 5, at ¶ 10. Defendant will only address those alleged instances of different treatment that have not previously been addressed elsewhere above.

As another example of how Satherlie allegedly treated Black employees differently than White employees, Knight claims that Nace was paid "on time" while Outlaw was not.[25] As discussed above, the Hospital's Department of Human Resources informed Satherlie in mid-March 2001 that Outlaw's employment had to be terminated because she had failed to disclose a previous felony conviction on her Hospital application. Satherlie Aff., ¶ 9. On March 9, 2001, Satherlie approved and immediately submitted to the Hospital's payroll department a check requisition for payment in full of the hours Outlaw had worked up until that time. Id., ¶ 10, and Tab D. Outlaw was paid approximately twenty days later, by check dated March 29, 2001. Id. The check requisition for Nace was submitted on April 27, 2001, and, like Outlaw, he was paid twenty days later, by check dated May 17, 2001. Id., ¶ 12, and Tab F. Thus, contrary to Knight's allegation, there was no difference in the length of time it took the Hospital to pay Nace and Outlaw.[26]

(k) Ressa Cannada was Not Paid For Six Months, While Nace Was Paid Within a Reasonable Time.

Knight also claims that Ressa Cannada ("Cannada") who is Black, was not paid for six months, whereas Nace was paid "within a reasonable time."[27] While there was a delay in Cannada receiving her paycheck for the work she performed for the 21st Century Program, it had absolutely nothing to do with the color of her skin. As noted earlier, in early June 2001, the Hospital's payroll department required all 21st Century Program workers – both Black

---

[25] See App., Ex. 5, at No. 10

[26] At the time Satherlie submitted these requisitions, all individuals working for the 21st Century Program – both White and Black – (with the exception of plaintiff) were still being paid by the Hospital as independent contractors. Satherlie Aff., ¶ 18. Because independent contractors were not paid on a normal payroll schedule like regular Hospital employees, the Hospital's payroll department occasionally experienced a delay in issuing their checks. Id. Any such delay, however, certainly had no correlation to the skin color of Outlaw or Nace.

and White, who had previously been paid as independent contractors, to become employees of the Hospital. Satherlie Aff., ¶¶ 18 and 19, and Tab J. All 21st Century Program personnel received a memo explaining this requirement. Id., ¶ 19, and Tab J. Cannada, however, failed to go through the necessary administrative procedures to become a Hospital employee. Id., ¶ 20. Until she did so, the Hospital could not process her paycheck. Id. Some time later, Satherlie saw Cannada and reminded her that the Hospital still owed her for hours she worked for the 21st Century Program. Id. Cannada then completed the necessary administrative procedures to become a Hospital employee in or about October 2001 and was paid for the time she was still owed. Id.

[27] See App., Ex. 5, at No.10.

**(2) Even if Knight Could State a Prima Facie Case of Race Discrimination, the Hospital Had Legitimate, Non-Discriminatory Reasons for Terminating Her Employment.**

As discussed above, Knight cannot establish a prima facie case of race discrimination because there is absolutely no evidence that her termination took place under circumstances that would raise an inference of race discrimination. However, even if Knight could make out a prima facie case, Satherlie and the Hospital had legitimate, non-discriminatory reasons for terminating her employment. It is undisputed that upon returning to work from vacation on June 18, 2001, Satherlie received a telephone call from Principal Irizarry and Irizarry informed her that on June 15, 2001, Knight – a Hospital employee and representative – displayed rude and unprofessional conduct toward her, Vice Principal Santiago, and her administrative assistant Magartia Santana. Satherlie Aff., ¶ 24. Principal Irizarry then forwarded Satherlie a letter and two memos describing in detail Knight's rude and inappropriate conduct. Id. Satherlie was particularly troubled by Knight's conduct because Knight was the sole representative of the Hospital on-site at Bulkeley, and her conduct reflected poorly upon the Hospital. Satherlie Aff., ¶ 25. Taking into consideration Knight's admittedly disrespectful June 8th verbal outburst toward Satherlie in the presence of Stanisclaus and Noir, her questionable truthfulness, continuing performance problems, and, most importantly, her rude and inappropriate conduct on June 15 toward the Bulkeley administrators, Satherlie determined that Knight's employment with the Hospital should be terminated. Id. Satherlie reviewed her decision with her supervisor, Maxwell, who agreed.

Id. Satherlie and Maxwell met with Knight on June 21, 2001 and explained that her employment was terminated for the foregoing reasons. Id., ¶ 26.

During the meeting, Knight presented Satherlie and Maxwell with a Memo purportedly addressing several of the reasons that she claimed contributed to her lack of progress as Program Coordinator. Id., ¶ 27. Maxwell told Knight that they would suspend the meeting to consider these issues and would reconvene the following day.[28] Id. After considering the issues Knight raised in her memo, Satherlie and Maxwell concluded that they did not mitigate any of the factors that led to the decision to terminate her employment. Id., ¶ 28. They attempted to arrange another meeting with Knight on June 22, but were informed by Knight's husband that she would be unable to attend. Id. As a result, Maxwell notified Knight in writing that the decision to terminate her employment remained unchanged. Id., and Tab O.

**C. To the Extent That Plaintiff Claims She Was Subjected to Race-Based Harassment, There is No Evidence in the Record to Support Such a Claim.**

Most, if not all, of the discrimination alleged by plaintiff revolves around general allegations that Satherlie treated Black employees differently than White employees.[29] Despite three passing references in the Complaint to "racial harassment" (Comp., ¶¶ 1, 2 and 2(a) of Request for Relief), plaintiff has not pled any factual allegations that even

---

[28] It is interesting to note that even though Knight testified at her deposition that at the time of the June 21 meeting she believed that she was the subject of discrimination in the workplace, she failed to make any mention of race discrimination in her memo. Knight Depo., pp.133-136; App., Ex.2 at Tab N. Indeed, during her employment with the Hospital, Knight never complained that she was the victim of race discrimination. Knight Depo., pp.135-136. The first time she claimed race discrimination in connection with her Hospital employment was in her complaint to the CHRO. Id.,p.136.

[29] See Comp., ¶¶ 14 & 18.

remotely support a claim that she was subject to a racially hostile work environment. In fact, Knight testified that she was not aware of either Satherlie or Maxwell ever using any racially derogatory language. Knight Depo., pp.67-69.[30] Furthermore, Knight never complained to anyone that she was subjected to race discrimination during her Hospital employment until she filed her complaint with the CHRO. Id., pp.135-136.

Nevertheless, plaintiff's discovery responses clarify that to the extent she is making a claim for "racially-based harassment," she is relying on the same allegations of differential treatment that have been discussed in sections B(1)(a) through (k), above.[31] Even if plaintiff could establish that any of her allegations of differential treatment were true - which they are not - they would not substantiate a claim for a racially hostile work environment.

To establish a prima facie case of discrimination under a hostile work environment theory, Knight would need to demonstrate that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult ... sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Howley v. Town of Stratford, 217 F.3d 141, 153 (2nd Cir. 2000) (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367 (1993)). The plaintiff must demonstrate "either that a

---

[30] Even though Knight testified that Maxwell had made "racially derogatory remarks," a review of Knight's testimony about what Maxwell allegedly said reveals that it was not racially derogatory.

[31] Defendant's Interrogatory no. 14 asks "[w]ith respect to your allegation in Paragraph 2a of the Complaint's Request for Relief, that 'the Defendants have discriminated against Ms. Knight on the basis of her race ... by subjecting her to racially-based harassment," identify every individual whom you believe has personal knowledge pertaining to this allegation, indicating the nature and substance of his her knowledge." Plaintiff responds: "Erica Stantisclaus witnessed harassment of the Plaintiff on a day to day basis. See Answers to Interrogatories 5, 7, 8, 10. Linda Jensen witnessed the 6/21/01 meeting." Plaintiff has not identified any of the alleged "harassment" witnessed by Stanisclaus. All of the allegations from plaintiff's responses to Interrogatories 5, 7 & 10 have been explored in Sections B(1)(a) through (k), above. Plaintiff's response to Interrogatory 8 deals solely with the allegation that her desk was "dismantled." The defendant's alleged

single incident was extraordinarily severe, or that a series of incidents sufficiently continuous and concerted to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2nd Cir. 2002) (internal quotation marks omitted). To establish a hostile work environment based on the plaintiff's race, "the conduct must be intimidating hostile, or offensive with discriminatory intimidation, ridicule, and insult permeating the workplace." Gallagher v. Delaney, 139 F.3d 338, 347 (2nd Cir. 1998). It is axiomatic that a plaintiff "must produce evidence that [s]he was discriminated against because of [her] race." Richardson v. New York State Dep't of Correction Serv., 180 F.3d 426, 440 (2nd Cir. 1999); see e.g., Narvarte v. Chase Manhattan Bank, N.A., 2000 U.S. Dist. LEXIS 5836, 2000 WL 547031, at *10 (S.D.N.Y. May 4, 2000) (claims of overzealous monitoring of plaintiff's arrival times and negative performance evaluations do not demonstrate discrimination on account of race)[32]; Murray-Dahnir v. Loew's Corp., 1999 U.S. Dist. LEXIS 12973, 1999 WL 639699, at *4 (S.D.N.Y. Aug. 23, 1999)(claims that plaintiff was forced to work longer hours without adequate staff support and that supervisor "ceased direct communications" and reprimanded plaintiff "publicly and unjustifiably on numerous occasions" failed to establish hostile work environment claim).[33]

There is absolutely no evidence in the record to support a claim by Knight that she was subjected to any race-based harassment. Almost all of plaintiff's allegations of disparate treatment involve other Black employees – not her. Further, there is nothing "hostile" about

---

harassment of the plaintiff at the 6/21/01 meeting witnessed by Linda Jensen is discussed in plaintiff's response to Interrogatory 5.

[32] See App., Ex. 9.

[33] See App., Ex. 10.

any of the alleged conduct. Knight merely attempts to show – unsuccessfully – that Satherlie showed favoritism toward White employees. None of these allegations can sustain a hostile work environment claim.

Focusing on the few allegations that pertain directly to the plaintiff (i.e., she was not provided with necessary resources, was required to advance funds for supplies, was spoken to in a disrespectful manner), even if these allegations were true and were considered together as whole, they would still fall far short of the level of conduct necessary to create a hostile work environment. Moreover, there is absolutely no evidence that any of this alleged treatment was due to plaintiff's race.

**D. Plaintiff Cannot State a Prima Facie Case of Retaliation Under Title VII.**

Plaintiff also makes vague and unsupported allegations that she was subjected to "retaliation" in the workplace.[34] Title VII makes it unlawful for an employer to discriminate against an employee "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII is violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993). To establish a *prima facie* case of retaliation, an employee must show '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" Quinn v. Green Tree

[34] See Comp., ¶¶ 2, 10 and 11.

Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995)).

Plaintiff cannot state a prima facie case of retaliation because she has not engaged in *any* protected activity. When questioned about her retaliation claim, plaintiff testified as follows:

> Q: Are you claiming in any way that Hartford Hospital discriminated – strike that. So essentially you are claiming that your termination – is one of your claims that your termination was retaliatory for you pursuing this investigation of this individual who claimed to have taught SAT class? Is that one of your claims? That Hartford Hospital retaliated against you for pursuing that investigation?
> A: Yeah, I pursued it, yes.
> Q: Is that one of your claims?
> A: Yes.
> Q: Are you claiming retaliation based on anything else?
> A: I am not quite clear what you're saying.
> Q: Are you claiming that they retaliated against you based on anything else you may have done?
> A: I can't answer that right now.
> Q: Well, I need you to answer it yes or no. Either you're aware or you're not aware.
> A: My head is confused. What are you saying?
> Q: You can read it again.
> A: State the question.
> (Reporter read the last question.)
> A: What do you mean by retaliated against me?
> Q: Retaliate. The common, you know, to take action against someone for something they may have done. Are you claiming they took action of terminating your employment due to something that you did, some action that you took? I understand that you're making this claim that they retaliated against you based upon the fact that you were raising a question about why Mr. Nace was paid for classes that you believe he didn't teach. I understand that that is one of your claims of retaliation. Are you claiming they retaliated against you for any other action that you took?
> A: I don't know. I can't think right now, no. I can't think.
> Q: So you're not aware of any others?
> A: I would have to give it more thought.
> Q: I'm sorry, but you don't have time to give it more thought. I need to get –

A: I can't give you a yes or no, so I don't know what to do.
Q: It's a yes or no answer. Either you are claiming that or your not claiming that, one or the other. It's your lawsuit. You brought the lawsuit, so either you are or you aren't?
MS. CORRIVEAU: Objection. She answered. She said she doesn't know at this time.
MR. GOUMAS: She said she can't give a yes or no at this time, but it's a yes or no question and she brought the lawsuit so she has to answer the question.
MS. CORRIVEAU: If she doesn't know right now, she doesn't no right now.
MR. GOUMAS: She can say no, she is not aware, but she needs to answer the question.
Q: Are you claiming in this action – I will ask you for a third time – are you claiming that Hartford Hospital has retaliated, or that Hartford Hospital retaliated against you by terminating your employment due to some action that you took other than your claim that they terminated your employment because you were pursing Mr. Nace in an investigation against Mr. Nace in connection with him allegedly getting paid for classes that he didn't teach?
A: And I brought out various issues when I met on the 21st to Susan Maxwell that the Hospital wasn't aware of, and that may have been another reason because there were a lot of issues brought out at the end of that meeting when I was getting ready to part that I kind of laid on the table and told Susan what I had been going through for the past six months. And, at this point, she said she needed to meet with me, so I think in order to –
Q: *But you had been told at that point that your employment was being terminated?*
A: *Yes.*
Q: *And you brought these issues out afterwards?*
A: *Yes.*
Q: Other than those issues you claim to have brought out afterwards, was there – is there anything else that you did or said that you believe Hartford Hospital would have wanted to retaliate against you for saying?
A: Yes, because I felt at that meeting when I was walking out the door, so many issues had come up that maybe it would have even – I don't want to use the word not publicized, but let it be known how the program was run, you know, the various things that had occurred.
Q: *But before that, I mean, correct me if I'm wrong, but before you raised those issues as you were walking out the door, were you, I mean, at the beginning of the meeting you were told that your employment was being terminated, correct?*
A: *Correct.*

Knight, p.121, ln.20-25; 122-125; 126, ln.1-4 (emphasis added).

Apparently, plaintiff claims that the Hospital retaliated against her for: (1) pursuing her investigation of Nace's alleged timesheet falsification; and (2) for raising her concerns about the way the Program was being run during her termination meeting on June 21, 2001. Id. However, her actions are not protected activity under Title VII.[35] Plaintiff advised Satherlie that she suspected that Nace falsified his timesheets and other documents relating to the SAT prep class, then she apparently investigated his alleged misconduct. Even if one accepts as true plaintiff's allegation that the Hospital terminated her employment because she investigated Nace – which it vehemently denies – such investigation was not protected activity. Title VII's anti-retaliation provision makes it unlawful to retaliate against an employee, "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Her investigation had no connection to any protected classification under Title VII.

Second, plaintiff claims that she was terminated in retaliation for the issues she raised with Satherlie and Maxwell during her termination meeting. None of those issues, however, had anything to do with race or allegations of race discrimination.[36] The memo she presented to Maxwell and Satherlie contained no mention of any concerns regarding race discrimination. Knight Depo., p.133, ln.14-25; 134-136; Satherlie Aff., at Tab N. Knight did not claim that the Hospital discriminated against her based on her race until she filed a

---

[35] As noted above, it is undisputed that plaintiff never complained of race discrimination until she filed a complaint with the CHRO following her termination. Knight, pp.135-136.

claim with the CHRO many months following her termination. Knight Depo., p.135, ln.21-25; p.136, ln.1-4. Most importantly, however, during her termination meeting with Satherlie and Maxwell, Knight did not raise any of these issues pertaining to "how the program was being run" until *after* she was told that her employment was terminated. Thus, it is impossible that her termination was the result of anything she may have said during the termination meeting.

[36] See App., Ex. 5, at No. 5 (5(a)-(e)).

## IV. CONCLUSION

Because there is no genuine issue of material fact, and the Hospital is entitled to judgment as a matter of law, its Motion for Summary Judgment on Count One of the Complaint should be granted.

DEFENDANT,
HARTFORD HOSPITAL

By: ______________________

Brenda A. Eckert
Federal Bar No. CT 00021
Gregg P. Goumas
Federal Bar No. CT 19095
Shipman & Goodwin LLP
One American Row
Hartford, CT 06103-2819
Tel: (860) 251-5000
Fax: (860) 251-5599

**CERTIFICATION OF SERVICE**

I hereby certify that a copy of the foregoing Defendant, Hartford Hospital's Memorandum of Law in Support of Its Motion for Summary Judgment was mailed on this 26th day of November, 2003, via first class mail, postage prepaid, as follows:

Francis A. Miniter, Esq.
Miniter & Associates
147 Charter Oak Avenue
Hartford, CT 06106
(counsel for the plaintiff)

Ann F. Bird, Esq.
Assistant Corporation Counsel
City of Hartford
550 Main Street
Hartford, CT 06103
(counsel for Hartford Public Schools)

With Courtesy Copy to:

The Honorable Mark R. Kravitz
Chambers
United States District Court
141 Church Street
New Haven, CT 06510

Gregg P. Goumas

358770 v.01 S1