FILED
Nov 26 1 33 PM '03
U.S. DISTRICT COURT
NEW HAVEN, CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ELAINE KNIGHT, : CIVIL ACTION NO.
: 3:02-cv-1697 (MRK)
Plaintiff, :
:
v. :
:
HARTFORD HOSPITAL, et al. :
:
Defendants. : November 26, 2003

**DEFENDANT HARTFORD HOSPITAL'S**
**LOCAL RULE 56(a)(1) STATEMENT**

1. Plaintiff, Elaine Knight ("Knight"), began her full-time employment as the Coordinator of the 21st Century Program at Bulkeley High School on January 8, 2001, as a full-time employee earning $39,000 per year. Deposition Transcript of Elaine Knight ["Knight Depo."], p.46, ln.10; Affidavit of Lynn Satherlie Deasy ["Satherlie Aff."], ¶ 5.

2. As coordinator for the 21st Century Program at Bulkeley, Knight was employed by Hartford Hospital (the "Hospital"). Id., p.47, ln.9-11.

3. Lynn Satherlie ("Satherlie") is an employee of the Hospital and serves as Director of the 21st Century Program. Satherlie was Knight's immediate supervisor. Satherlie Aff., ¶¶ 2 and 5; Complaint ["Comp."], ¶ 10.

4. Susan Maxwell ("Maxwell") was Satherlie's immediate supervisor during Knight's tenure as Coordinator of the 21st Century Program. Comp., ¶ 11.

5. Knight never heard Satherlie make any racially derogatory remarks. Knight Depo., p.67, ln.22-25; p.68, ln.1.

6. When asked at her deposition whether she ever heard Susan Maxwell make any racially derogatory remarks, Knight testified as follows:

> Q: Now, back to my question, I would like you to answer my question. Do you have any basis to claim or are you claiming in this lawsuit that Susan Maxwell made some racially derogatory remark to you, and what is the specific remark you're claiming?

A: That I was fired.
Q: Just that you were fired?
A: Yes. Because I feel that anyone, whether they are Black or White, should be given an opportunity to speak before any judgment is made. I don't think you should just take and hear one side of a story without – and then make a decision. I was not given that opportunity.

Id., p.70, ln.1-16.

**Alleged Different Treatment**

**(a) Purchase of Office Supplies**

7. Each time Knight bought supplies using her own fund she was reimbursed. Id., p.147, ln.13-19.

8. Knight testified at her deposition as follows:

Q: Other than the one-time occurrence where you testified that Madonna was provided with supplies directly by Lynn and you had to advance funds yourself to get supplied, other than that one-time occurrence, do you have any other factual basis upon which you're relying to suggest that Hartford Hospital or Hartford Board of Education's failure to supply supplies and resources was based on your race?
A: Rephrase that.

(Reporter read back the last question.)

A: Let's see. I can't recall. I can't recall.
Q: It's a yes or no question. Either you have a factual basis to support your claim or you don't. Are you aware of any facts?
A: Other than that one time?
Q: Right.
A: I guess I would have to – at this point, I have to say no.

Id., p.174, ln.10-25; p.175, ln.1-8.

9. To the extent that Knight ever had to advance funds to purchase office supplies, the cost of the office supplies was insignificant. Id., p.149, ln.5-6.

**(b) Alleged Inflexible Work Hours**

10. Knight testified as follows at her deposition:

Q: Your allegation is that Madonna was allowed to have flexible work hours and you were not. I want to know what flexible hours you requested. I want to know when you made this request.
A: I didn't formally make any request because I didn't feel like I could. It was just such a demand and pressure on me. I had so much workload that to put in a request for time or flexible hours, I wasn't even getting paid for the stuff I did at home nor the overtime, so time off was like out of the question.
Q: So this would be inaccurate when it says that Madonna was allowed to have flexible work hours when you were not, because you, in essence, never asked to have flexible work hours?
A: I guess, yes.
Q: So that's inaccurate?
A: I guess you could say that, yes.

Id., p.209, ln.8-25; p.210, ln.1.

11. Knight testified that her regular work hours were 8:00 AM to 4:00 PM. Id., p.208, ln.9-15.

**(c) Alleged Disrespectful Treatment of Plaintiff**

12. When questioned at her deposition about her allegation that Satherlie did not speak to her in a respectful manner, Knight testified as follows:

Q: Interrogatory 7, "Lynn addressed Madonna in a respectful manner unlike how Plaintiff was treated." I would like you to tell me specifically, are you referring here to -- are you claiming that Ms. Satherlie addressed you in a disrespectful manner?
A: Courteous. She tended to be polite, kind and more friendly toward Madonna than me.
Q: Can you provide me with any specifics of how you were treated such as it states here in your sworn response to interrogatory 7?
A: She would come in and sometimes she would question Madonna about things and I would stand there and either have – if I was talking to Lynn, Madonna would interrupt me, interject and say, "I can find this, I can do that." And I felt that they just had developed a rapport, you know, where I was not in the loop.
Q: I would like you to identify for me any specific events that you can recall in which you claim that Ms. Satherlie, or Ms. Maxwell, spoke with you disrespectfully. Any specific events, specific conversations?

A: Well, when Lynn sat in the cafeteria that day and she said that I was a liar, that I was lying to her, the day that I didn't make the meeting, I thought that that was totally out of order because she didn't really give me a chance to talk. And after I explained it to her, she still went in and wrote up that I was lying to her. So, I just felt that that was a lack of respect. And – I'm tired.

Q: Is there anything about that conversation to suggest to you that she was showing you disrespect because you're African-American?

A: It was a tone and manner. It was always a demeaning tone and manner. It was an overall general tone and manner.

Q: Is that it?

A: Yes.

Id., p.211, ln.14-25; p.212; p.213, ln.1-4.

13. When questioned about how Satherlie was rude to her, she further testified:

Q: I'm sorry. There is no question pending. And you say, "See attached." At the end of interrogatory No. 7, your response to No. 7, you say, "Individuals who have personal knowledge of discrimination against the plaintiff." And you say, "Carol Green attended April 2001 Parent Advisory Board meeting and observed Lynn Satherlie allowing Caucasian teachers to speak and state their opinions while addressing the plaintiff rudely." Which Caucasian teachers are you claiming were allowed to speak?

A: I would have to look. It was general conversation. And when it was over, Ms. Green and I spoke. And she, by us both being two African-American women, we know and feel in the sense when you're being discriminated, it's something that you can communicate with the eyes, and she came to me and tried to comfort me. And I let her know it was okay.

Q: And what was it specifically that led you to the conclusion that after that meeting that you were being discriminated against because you were African American? I want to know the specific factual basis for your belief at that time.

A: Because they were allowed to voice their opinion. They were allowed and granted permission to speak. They were addressed in a very, very cordial and polite manner. And she made some comments to me about – oh, I had prepared the summer program and I had – it was a handout to the Advisory Board meeting, or if it wasn't the summer program – I'm sorry. It was the goal and objective, but there was a handout I had submitted to everyone in the Advisory Board meeting. And they were reading it like we are, reviewing it. Before Lynn even read it, she began to state what was missing and just said, "You were supposed to put this in and you didn't put this in." And when she finished chewing my document apart, I turned to her, and said, "Yes, it's on

such and such a page." And then Ms. Green looked over at me, and I looked at her, and it was like, "Okay."

Q: So you're saying Lynn was rude to you?

A: Yes.

Q: Now, other than that, do you have any other factual basis for claiming that Ms. Satherlie's conduct at this meeting is evidence of race discrimination other than what you just testified to?

A: Not at this time. I'm really tired.

Id., pp.214-216.

**(d) Alleged Payments to White Teacher for Time He Did Not Work**
**(e) Termination of Black Drill-Step Teacher**

14. Knight was a salaried Hospital employee earning $39,000 per year. Satherlie Aff., ¶ 5.

15. Emil Nace was employed by the Hartford Public Schools as a math teacher. Knight Depo., p.193.

16. Because Nace was an employee of the Hartford Public Schools, Satherlie had no way to discipline him. Id.

17. Knight does not know whether Nace taught an SAT Prep Course for the 21st Century Program. Id., p.165, ln.16-20; p.168, ln.25; p.169, ln.1-3.

18. Knight never presented Satherlie with any physical evidence that Nace did not teach the classes he claimed to have taught. Id., p.161, ln.6-10.

19. Satherlie was advised by a representative of the Hospital's Department of Human Resources that Antoinette Outlaw had not disclosed a felony conviction on her Hospital employment application. Satherlie Aff., ¶ 9..

20. The representative from the Department of Human Resources told Satherlie that Outlaw's failure to disclose her felony conviction on her application violated Hospital policy, and, as a result, her employment had to be terminated. Id., and Tab C.

21. Hospital's Human Resource Policy and Procedure #001 ("Rules of Conduct") provides, in part:

> Any of the following violations will be sufficient grounds for disciplinary action, ranging from verbal reprimand to immediate discharge, depending upon the seriousness of the offense in the judgement of management. These

> rules are to serve as a guide and are not intended to be an all-inclusive list of the violations that may require disciplinary action:
>
> ...
>
> Conviction of a felony.
>
> ...
>
> Falsifying personnel or patient records, applications or other data.

Id.

22. Antoinette Outlaw has a felony conviction on her criminal record. Satherlie Aff., and Tab B.

23. Satherlie did not make the decision to terminate Outlaw's employment. That decision was made by the Hospital's Department of Human Resources. Satherlie Aff., ¶ 9.

**(f) Alleged Failure to Provide Adequate Resources – Failure to Provide Transportation for after-school Programs**

24. When asked at her deposition about the Hospital's alleged failure to provide her with resources such as a copier, fax, and printer, plaintiff testified as follows:

> Q: Do you have any factual basis, any facts that you can articulate as you sit here today to support any claim that you were denied any of these things, a copier, fax, printer, or access to email due to your race?
> A: Well, it appeared that the other non-African-American people had access to things that I didn't have access to. And I just had to accept that fact, that I would not have those resources.
> Q: When you say the other non-African-American people, who are you talking about?
> A: Some of the staff.
> Q: Those were employees of the Hartford Public Schools?
> A: Right.
> Q: But you weren't employed by Hartford Public Schools. You were employed by Hartford Hospital?
> A: But Hartford Hospital was responsible for me running a program and they were responsible for providing me with resources. You cannot tell me to make a cake and don't give me flour.
> Q: I understand, but Hartford Hospital was not responsible for providing a copier, a fax machine, a telephone, a printer, and email access to all the employees of the Hartford Public Schools, correct? They didn't provide those resources to the Hartford Public Schools?
> A: Are you saying to the Hartford Public Schools?
> Q: Yes.

A: No. You're saying Hartford Hospital was not responsible for providing those resources to Hartford Public Schools?
Q: That's my question.
A: Yes. It was not.
Q: It was not Hartford Hospital's responsibility to provide those to the employees of the Hartford Public Schools.
A: Yes.
Q: That was the responsibility of the Hartford Public Schools, correct?
A: Yes.

Knight Depo., p.221-222.

25. Plaintiff's only factual basis for her claim that she was denied access to various resources, such as a fax machine, copier, telephone, and email – based on her race, is her belief that non-Black Hartford Public Schools Personnel had access to such resources. Id., pp.275-81.

26. Neither Satherlie nor any other Hospital employee played any role in providing these resources to Hartford Public Schools personnel. Id.

27. When asked at her deposition why she believed Hartford Hospital's alleged failure to provide her with bus transportation for 21st Century after-school programs was based on her race, Knight testified as follows:

A: I feel that they had other after-school programs who had coordinators that were White who got the support from the Board of Ed or Hartford Hospital to transport students for field trips, whatever, and they received that and I couldn't. I was just running around in a circle.
Q: Hartford Hospital is not involved in any other 21st Century programs, correct?
A: Not to my knowledge. You would have to pose that question to Lynn [Satherlie].
Q: Your response to my question is that you said other schools, other programs, had gotten support from Hartford Hospital, but you don't know – let me finish the question – you don't know whether Hartford Hospital has anything to do with any other programs though, correct.?
A: Yes, I don't know that.
Q: You don't know that?
A: No.
Q: So, therefore, you have no basis to claim that Ms. Satherlie or Hartford Hospital treated any other 21st Century programs with White program coordinators differently than she treated you, correct?
A: Correct.

Id., p.76, ln.25; p.76; p.77m ln.1-5.

28. The Hospital is not involved in any other 21st Century Programs. Satherlie Aff., ¶ 4.

**(g) Satherlie's Alleged Unfair Hiring Practice**

29. Initially, with the exception of Knight, all individuals hired by the Hospital to perform services for the 21st Century Program, both Black and White, were hired as independent contractors. Satherlie Aff., ¶ 18.

30. Later, all individuals who had been hired by the Hospital to perform services for the 21st Century Program were required to required by the Hospital's payroll department to go through all of the Hospital's pre-employment requirements and become Hospital employees rather than independent contractors. Id., at ¶ 19.

31. Satherlie was not responsible for determining what administrative procedures individuals working for the 21st Century Program would need to follow prior to getting paid. Id.

**(h) Satherlie Allegedly Told Plaintiff to Ignore Warnings**

32. None of Knight's written warnings were ever removed from her personnel file. Affidavit of Ed Hachadourian ("Hachadourian Aff."), ¶ 5.

**(i) Alleged Dismantling of Knight's**

33. Knight has no reason to believe that Satherlie or any other Hospital employee was in any way responsible for her desk being "dismantled" or for the alleged disappearance of any files from her desk. Knight Depo., p.108, ln.3-13; p.119, ln.19-25' p.120, ln.1.

34. After Satherlie learned that Knight's workspace had been disturbed, Satherlie inquired of Principal Evelyn Irizarry as to the reasons why and was advised by Irizarry that Vice Principal Santiago would meet with Knight to discuss any concerns Knight may have. Satherlie Aff., ¶ 21.

**(j) Alleged Failure to Pay Outlaw Promptly**

35. On March 9, 2001, Satherlie approved and submitted to the Hospital's payroll department a check requisition for payment in full of the hours Outlaw had worked to date. Outlaw was paid twenty days later, by check dated March 29, 2001. Id., ¶ 10, and Tab D.

36. On April 27, 2001, Satherlie approved and submitted a check requisition for Nace, Nace was paid twenty days later, by check dated May 17, 2001. Id., ¶ 12, and Tab F.

37. Kay Stark ("Stark") and Diane Hazel ("Hazel") were both teachers at Bulkeley High School. Knight Depo., pp.64-67.

38. Stark and Hazel are White. Knight Depo., Id., p.67, ln.18-21.

**(k) Alleged Failure Not to Pay Reesa Cannada Within Reasonable Time**

39. Cannada did not comply with the Hospital's pre-employment hiring procedures until October, 2001. Satherlie Aff., ¶ 20, and Tab K.

**Written Warnings**

40. Satherlie documented a March 21, 2001 phone conversation with Knight and sent a copy of the documented conversation to Knight's personnel file in Human Resources. Satherlie Aff., ¶ 8, and Tab A.

41. On June 6, 2001 the 21st Century Program held its regular weekly meeting. Knight Depo., p.84, ln.10-19.

42. As project Coordinator, it was important for Knight to be at the weekly meeting. Id., p.88, ln.20-25.

43. Knight was not at the meeting. Id., p.84, ln.10-19.

44. Satherlie spoke with Knight on June 6, 2001 and asked her why she was not at the meeting. Knight told Satherlie that she was not at the weekly 21st Century Program meeting "because [she] was on the phone with one of [her] employees, Madonna, who was upset about the recent changes in how the 21st Century employees would be paid." Id.

45. Later, Knight told Satherlie that the reason she missed the weekly 21st Century Meeting was not because she was on the phone, but rather because she had a seizure. Id., p.89, ln.1-6.

46. Satherlie believed that Knight's change in her explanation as to why she missed the meeting raised questions about her truthfulness. Satherlie Aff., ¶ 22. As a result, Satherlie drafted a Memo to Knight titled "Written Warning on Performance Improvement" (Id., and Tab L), and presented it to Knight on June 7, 2001. Knight Depo., p.83, ln.23-25; p.84, ln.1-9.

47. After receiving the Written Warning, in Satherlie's presence, Knight showed the Written Warning to her administrative assistants, Stanisclaus and Noir, and in a loud

voice started making disrespectful comments about Satherlie. Id., p.91, ln.17-25; pp.92, 93 and 94, ln.1-2.

48. By Memo dated April 12, 2001, Knight was placed in the Hospital's Performance Improvement Process. Satherlie Aff. ¶ 11, and Tab E.

49. None of the documents referred to in paragraphs 40, 46 and/or 48 were ever removed from Knight's personnel file. Hachadourian Aff., ¶ 5.

**Alleged Retaliation**

50. The first time Knight ever complained of discrimination was when she filed a complaint with the Commission on Human Rights and Opportunities. Knight Depo., pp.135-136.

51. When asked at her deposition about her retaliation claim, Knight testified as follows:

Q: Are you claiming in any way that Hartford Hospital discriminated – strike that. So essentially you are claiming that your termination – is one of your claims that your termination was retaliatory for you pursuing this investigation of this individual who claimed to have taught SAT class? Is that one of your claims? That Hartford Hospital retaliated against you for pursuing that investigation?
A: Yeah, I pursued it, yes.
Q: Is that one of your claims?
A: Yes.
Q: Are you claiming retaliation based on anything else?
A: I am not quite clear what you're saying.
Q: Are you claiming that they retaliated against you based on anything else you may have done?
A: I can't answer that right now.
Q: Well, I need you to answer it yes or no. Either you're aware or you're not aware.
A: My head is confused. What are you saying?
Q: You can read it again.
A: State the question.
(Reporter read the last question.)
A: What do you mean by retaliated against me?
Q: Retaliate. The common, you know, to take action against someone for something they may have done. Are you claiming they took action of terminating your employment due to something that you did, some action that you took? I understand that you're making this claim that they retaliated

against you based upon the fact that you were raising a question about why Mr. Nace was paid for classes that you believe he didn't teach. I understand that that is one of your claims of retaliation. Are you claiming they retaliated against you for any other action that you took?

A: I don't know. I can't think right now, no. I can't think.

Q: So you're not aware of any others?

A: I would have to give it more thought.

Q: I'm sorry, but you don't have time to give it more thought. I need to get –

A: I can't give you a yes or no, so I don't know what to do.

Q: It's a yes or no answer. Either you are claiming that or your not claiming that, one or the other. It's your lawsuit. You brought the lawsuit, so either you are or you aren't?

MS. CORRIVEAU: Objection. She answered. She said she doesn't know at this time.

MR. GOUMAS: She said she can't give a yes or no at this time, but it's a yes or no question and she brought the lawsuit so she has to answer the question.

MS. CORRIVEAU: If she doesn't know right now, she doesn't no right now.

MR. GOUMAS: She can say no, she is not aware, but she needs to answer the question.

Q: Are you claiming in this action – I will ask you for a third time – are you claiming that Hartford Hospital has retaliated, or that Hartford Hospital retaliated against you by terminating your employment due to some action that you took other than your claim that they terminated your employment because you were pursing Mr. Nace in an investigation against Mr. Nace in connection with him allegedly getting paid for classes that he didn't teach?

A: And I brought out various issues when I met on the 21st to Susan Maxwell that the Hospital wasn't aware of, and that may have been another reason because there were a lot of issues brought out at the end of that meeting when I was getting ready to part that I kind of laid on the table and told Susan what I had been going through for the past six months. And, at this point, she said she needed to meet with me, so I think in order to –

Q: But you had been told at that point that your employment was being terminated?

A: Yes.

Q: And you brought these issues out afterwards?

A: Yes.

Q: Other than those issues you claim to have brought out afterwards, was there – is there anything else that you did or said that you believe Hartford Hospital would have wanted to retaliate against you for saying?

A: Yes, because I felt at that meeting when I was walking out the door, so many issues had come up that maybe it would have even – I don't want to use the word not publicized, but let it be known how the program was run, you know, the various things that had occurred.

Q: But before that, I mean, correct me if I'm wrong, but before you raised those issues as you were walking out the door, were you, I mean, at the beginning of the meeting you were told that your employment was being terminated, correct?
A: Correct.

Knight, p.121, ln.20-25; 122-125; 126, ln.1-4.

**Plaintiff's Rude and Inappropriate Conduct on June 15, 2001 and Subsequent Termination of her Employment**

52. On Monday, June 18, 2001, Satherlie received a telephone call from Bulkeley HS Principal Irizarry. Irizarry informed Satherlie that on Friday, June 15, 2001, Knight made rude and inappropriate comments to her and two other Bulkeley HS administrators. Satherlie Aff., ¶ 24.

53. Principal Irizarry then forwarded Satherlie a letter and two memos describing Knight's conduct on June 15, one from Vice Principal Santiago, and another from Margarita Santana. Id. and Tab M.

54. The letter from Principal Irizarry read as follows:

*June 20, 2001*

*Dear Ms. Satherlye [sic]:*

*This letter is to inform you of a disconcerting incident that occurred on Friday, June 15, 2001.*

*I was in my office meeting with a teacher when Ms. Elaine Knight came to the door and just stood there. I asked her to please excuse us since we were having a meeting and still she did not move. She just kept looking at me. I finally asked her what can I do for her and her response was "I guess you are too busy to see me, never mind." I told her to please see my secretary to schedule an appointment and she said: "I did, but everybody is too busy." I told her that it is true that we are all very busy; it is the closing of the school year. She then walked away mumbling something and giving body language and quite an uprofessional attitude. I expressed my concern regarding her attitude and she continued mumbling. I did hear her say: "You have an attitude." There were visitors in the Main Office who witnessed this incident. Had a HBOE employee behaved in such a manner, I would have recommended suspension pending an investigation. This is clearly defiance and insubordination.*

*Attached please find statements from other staff members who were also approached by her that same day. I don't know the exact chronology of the events, but I do know that Ms. Knight's behavior is very unprofessional and inappropriate. It has been brought to my attention by several staff members, that Ms. Knight's behavior lately is "weird." BHS's relationship with Hartford Hospital has always been a very positive one. I wish to emphasize that this is not a BHS/Hartford Hospital issue. It is an employee issue which must be addressed. I am recommending that Ms. Elaine Knight not work in a school setting. I am very worried about her "bizarre" behavior.*

*Please advise!*

*Respectfully,*

*/s/*

*Evelyn Irizarry*
*Principal*

*Cc: Rafael Lopez, Executive Vice Principal*

Id.

55. The Memo from Vice Principal Santiago read as follows:

*To:* *Ms. Knight*
*From:* *Mr. Santiago Vice-Principal*
*CC:* *Ms. E. Irizarry, Principal / Ms. Lynn Satherlie, Project Director, 21st Century Women's Health*
*Date:* *06/19/01*
*Re:* *Verbal Abuse*

*On Friday, June 15, 2001, you used the sort of language and displayed the kind of verbal immaturity for which we routinely reprove of students. I should hardly need to tell you that negative, inflammatory statements directed at me personally are not acceptable, nor are they in keeping with district policy.*

*You came into the data room and requested to meet with me. I then replied to you that I could not meet with you at this moment. The reason being that I had scheduled a meeting with a parent at the time. I told you that I was willing to meet with you, after I was done meeting with the parents. You came towards me insisting to meet with me. I gave you the same response as before. You kept following me into*

*my conference room using a loud tone of voice, and a very rude and unprofessional behavior.*

*During your verbal abuse towards me, which you were yelling, you used the following statements:*

- *You will not speak to me because I am a black woman.*
- *You called me a coward for not meeting with you at the precise moment.*

*As a result of this unprofessional verbal abuse towards me I feel obligated to write this reprimand and direct that a copy of this letter be filed with your permanent record.*

*This kind of behavior has no place in the Hartford School System or any place of work. My recommendation is for you to improve on your professional behavior or be transferred to another worksite.*

Id.

56. The Memo from Margarita Santana read as follows:

*To:* *Evelyn Irizarry, Principal*
*From:* *Margarita Santana, Executive Assistant*
*Date:* *June 20, 2001*
*Re:* *Elaine Knight*

*On Friday, June 15, 2001 Ms. Knight came to the Main Office and from the counter she asked me if she could see Ms. Irizarry, Principal. I told her that Ms. Irizarry's calendar was full for Friday, however I suggested that she could make an appointment for the following Monday, June 18th.*

*Ms. Knight got upset and from the main counter started making inappropriate comments. I told her that she should express and discuss her concerns with Ms. Irizarry on Monday. She continued making inappropriate comments and I repeated three times that she should discuss her concerns with Ms. Irizarry on Monday. She left the office very upset and said she was going to look for Mr. Santiago. Ms. Knight never gave me the opportunity of setting up the appointment and left the main office abruptly.*

*Later on she came back to the Main Office but this time she did not speak to me and went directly to Ms. Irizarry's office and stood by her door. Ms.*

> *Irizarry was meeting with a teacher and asked Ms. Knight to excuse her. Ms. Knight got very upset and while walking away said: "You have an attitude problem and you know it."*

Id.

57. After speaking with Principal Irizarry, and reviewing the letter and two memos regarding Knight's inappropriate behavior on June 15, Satherlie concluded that Knight's employment with the Hospital should be terminated. While Knight's conduct toward the Bulkeley administrators on June 15 was the principal motivating factor in Satherlie's decision, Satherlie also considered Knight's outburst toward her in connection with Knight's June 7 warning, her questionable truthfulness about why she missed the mandatory weekly program meeting, and her continuing performance problems. Satherlie consulted with her supervisor, Susan Maxwell, about her decision to terminate Knight's employment and Maxwell agreed. Satherlie Aff., ¶ 25.

58. Satherlie and Maxwell held a meeting with Knight on June 21, 2001. Knight Depo., p.133.

59. Knight presented Satherlie and Maxwell with a document entitled "Reflections/ Lessons & Issues." The memo did not mention the subject of alleged race discrimination. Id.; Satherlie Aff., ¶ 27, and Tab N.

60. Satherlie and Maxwell reviewed the memo but the issues raised therein did not mitigate any of the factors that led to the decision to terminate her employment. Satherlie Aff., ¶ 28.

DEFENDANT,
HARTFORD HOSPITAL

By: ______________________
Brenda A. Eckert
Federal Bar No. CT 00021
Gregg P. Goumas
Federal Bar No. CT 19095
Shipman & Goodwin LLP
One American Row
Hartford, CT 06103-2819
Tel: (860) 251-5000
Fax: (860) 251-5599

**CERTIFICATION OF SERVICE**

I hereby certify that a copy of the foregoing Defendant Hartford Hospital's Local Rule 56(a)(1) Statement was mailed on this 26th day of November, 2003, via first class mail, postage prepaid, as follows:

Francis A. Miniter, Esq.
Miniter & Associates
147 Charter Oak Avenue
Hartford, CT 06106
(counsel for the plaintiff)

Ann F. Bird, Esq.
Assistant Corporation Counsel
City of Hartford
550 Main Street
Hartford, CT 06103
(counsel for Hartford Public Schools)

With Courtesy Copy to:

The Honorable Mark R. Kravitz
Chambers
United States District Court
District of Connecticut
141 Church Street
New Haven, CT 06510

Gregg P. Goumas

358763 v.01 S1